United States District Court
Southern District of Texas
**ENTERED**
July 31, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| Constantin Avadanei, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil No. 4:26-cv-2177 |
| | § | |
| Martin Frink, *et al.*, | § | |
| | § | |
| Respondents. | § | |

# ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Before the Court is Respondent's Motion for Summary Judgment, Doc. 9. For the reasons set forth below, the Motion is GRANTED, and the Petition is DISMISSED WITHOUT PREJUDICE to re-filing a due process challenge to prolonged future detention and DISMISSED WITH PREJUDICE in all other respects.

## I. BACKGROUND

Petitioner Constantin Avadenei is a citizen and national of Romania who unlawfully entered the United States on April 27, 2014. Docs. 5 ¶ 44; 9-1. Avadenei was immediately placed in expedited removal proceedings but claimed a fear of persecution or torture if returned to Romania. Doc. 9-1. In his interview, an asylum officer found his fear credible. Doc. 9 at 1. But on February 11, 2015, an immigration judge ordered Petitioner removed to Portugal. Docs. 5 ¶ 2; 9-2. Eighty-seven days later, the Department of Homeland Security ("DHS") released Petitioner on an Order of Supervision ("OSUP"). Doc. 9-3.

On November 4, 2025, Petitioner was re-detained by Department of Homeland Security under 8 U.S.C. § 1231(a) to effectuate his removal, and he remains in the custody

of Respondent, Warden of the Houston Contract Detention Facility, in Houston, Texas. Docs. 5-1, 5-3, 9 at 3, 9-4. Respondents sent request for acceptance emails to Portugal and France in December 2025. Doc. 9-7 ¶¶ 16–18. Although France denied the latter request in January, the Consulate of Portugal continued to exchange emails with DHS regarding removal through May. Doc. 9-7 ¶ 26. DHS continues to correspond with the State Department to pursue other third-country removal options for Petitioner. *Id.* ¶¶ 31–32; Doc. 13-1 ¶ 31.

Petitioner filed a Petition for a writ of *habeas corpus* under 28 U.S.C. § 2241 on the grounds that his present detention violates (i) due process under *Zadvydas v. Davis*, 533 U.S. 678 (2001);[1] (ii) the Immigration and Nationality Act; (iii) the *Accardi* Doctrine;[2] and (iv) the Administrative Procedure Act. Doc. 5

Now before the Court is Respondent's Motion for Summary Judgment, Doc. 9, to which Petitioner has responded in opposition, Doc. 10. Respondent maintains that Petitioner's detention remains lawful because his removal is significantly likely to occur in the reasonably foreseeable future. Doc. 9 at 14.

---

[1] The Petition does not specify whether Petitioner argues his detention without a bond hearing violates substantive or procedural due process. *See* Doc. 5 ¶¶ 53–57. The Court assumes that Petitioner intends to raise due both due process challenges.

[2] *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954).

## II. ANALYSIS

When Petitioner filed his original Petition in March, Doc. 1, he had only been re-detained for four months, so his due process challenge was premature. *See* Doc. 12, *Qambari v. Mullin*, No. 4:26-cv-2547 (S.D. Tex. July 2, 2026); Doc. 9, *Martinez-Castillo v. Contreras*, No. 4:26-cv-2081 (S.D. Tex. July 14, 2026). But while this action remained pending, Petitioner's time in custody exceeded six months, thereby implicating *Zadvydas v. Davis*. Because the *Zadvydas* Court invoked the constitutional avoidance canon to construe the statute that authorizes Petitioner's detention, the Court first analyzes Petitioner's due process and statutory challenges in concert before turning to his remaining challenges.

### A. Due Process and Immigration and Naturalization Act

As of now, Petitioner's detention does not violate the Fifth Amendment's Due Process Clause or the Immigration and Naturalization Act ("INA"), as he has failed to provide good reason to believe that his removal is not significantly likely to occur in the reasonably foreseeable future.

The Court begins with a statutory overview. Once an alien is ordered removed from the country, 8 U.S.C. § 1231(a) governs that alien's continued detention. For the first ninety days following the issuance of a removal order—otherwise known as the "removal period"—detention is required. 8 U.S.C. § 1231(a)(1). Thereafter, the Attorney General has discretion to continue to detain several classes of removable aliens, including those deemed a risk to the community or unlikely to comply with the removal order. 8 U.S.C.

§ 1231(a)(6). Section 1231(a)(6) does not explicitly impose a time limit on discretionary detention. As written, the statute authorizes DHS to detain aliens subject to a final removal order indefinitely.

The Supreme Court confronted this issue in *Zadvydas v. Davis*. "[T]o avoid a serious constitutional threat," the *Zadvydas* Court "read in" a time limit, holding that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by [Section 1231(a)(6)]." *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001). And "[i]n order to limit the occasions when courts will need to make [difficult judgments]," the Court established a presumptively reasonable period of detention and a framework to assess detention thereafter. *Id.* at 700-01 (2001). The Court ultimately landed on a period of six months' detention, less than which should be presumed reasonable. But "[a]fter this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701.

The *Zadvydas* Court's six-month presumption was borne out of the Court's desire to seek "uniform administration in the federal courts" and "the Nation's need to 'speak with one voice' in immigration matters." *Id.* at 700–01. While the *Zadvydas* opinion left some important questions unanswered,[3] it nevertheless established clear analytical

---

[3] The *Zadvydas* opinion left open the question as to how to faithfully implement its holding in light of two issues, prematurity and aggregation, both of which this Court has recently addressed. First, this Court adopted a bright-line rule embraced by several other district courts: during the "presumptively reasonable" six-month period, constitutional challenges to detention are

parameters in situations where an alien has spent six months or in post-removal order custody. Specifically, that the alien carries the initial burden to provide "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. And only after the petitioner carries this burden must the Government respond "with evidence sufficient to rebut that showing." *Id.*

For more than two decades, this burden-shifting framework has provided a workable model for district courts. Generally, an alien would adduce evidence that some structural or diplomatic impediment—often a country's explicit refusal to accept repatriation—prevented DHS from removing the alien to the country designated in his removal order. In rebuttal, DHS would articulate a plan to secure travel documents to that country or tacitly concede defeat by releasing the alien.

The Trump Administration's third-country removal initiative, however, has fundamentally altered the constitutional calculus. In particular, the question now is how should courts apply the *Zadvydas* framework now that DHS is no longer beholden to the

---

premature. *Qambari v. Mullin*, 4:26-cv-2547 (S.D. Tex. July 2, 2026) (comparing *Cruz Medina v. Noem*, 794 F. Supp. 3d 365, 374 (D. Md. 2025) (collecting cases barring claims as premature) *with Ali v. Dep't of Homeland Sec.*, 451 F. Supp. 3d 703, 707 (S.D. Tex. 2020)). And second, the Court held that the government is entitled to a new presumptively reasonably six-month-period to effectuate removal for each discrete detention, absent evidence of a deliberate pattern of catch-and-release to elude judicial scrutiny. *Jillani v. Blanche*, 4:26-cv-4550 (S.D. Tex. July 28, 2026) (comparing *Phong Thanh Nguyen v. Scott*, 796 F. Supp. 3d 703 (W.D. Wash. Aug. 21, 2025) (endorsing aggregation) with *Barrios v. Ripa*, No. 1:25-CV-22644, 2025 WL 2280485, at *8 (S.D. Fla. Aug. 8, 2025) (reviewing each discrete detention period independently)).

designated removal order country. More countries yield more options, which in turn renders all aliens' removal much more likely to occur.

Consider the agency guidance. On March 30, 2025, Kristi Noem, the then-Secretary of Homeland Security, issued guidance on DHS's procedures to effectuate removals to countries other than those designated in removal orders. *See* Exhibit A to Motion for Indicative Ruling, *D.V.D. v. Dep't of Homeland Security*, 778 F. Supp. 3d 355 (D. Mass. 2025) (No. 1:25-cv-10676), Doc. 43-1 (Memorandum from Secretary of Homeland Security to U.S. Citizenship and Immigr. Servs. et al.). The memorandum clarified that once DHS informs an alien of his pending removal to a third country, the alien must affirmatively express a fear of persecution or torture for DHS to abate removal and screen the alien for credibility. Notably, when a district court sought to enjoin third country removals under this new policy, the Supreme Court stayed the injunction. *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153 (2025). Then-Acting Director of Immigration and Customs Enforcement Todd Lyons issued supplemental guidance reaffirming that aliens served with a Notice of Removal to a third country must affirmatively express fear of persecution or torture within twenty-four hours to forestall their removal. Exhibit A to Declaration of Simon Sandoval-Moshenberg, *D.V.D.*, 788 F. Supp. 3d 355 (No. 1:25-cv-10676), Doc. 190-1 (Letter from Acting Director of Immigration and Customs Enforcement to all ICE Employees (July. 9, 2025). The Administration has since negotiated repatriation agreements with several countries willing to absorb removable aliens.

The Court is unaware of any publicly available database reflecting the exact number of third country removals that have occurred in the last year, but related data is revealing. In the same month that Petitioner filed the original Petition, one tracker estimates that immigration judges issued an estimated 8,777 third-country removal orders to countries with which the United States has reached a repatriation agreement.[4] Mobile Pathways, Third Country Removals, https://www.mobilepathways.org/dashboards/third-country-removals (last visited July 27, 2026).

Ordinarily, this Court would not be inclined to cite changed circumstances or norms to define the Constitution's metes and bounds. But *Zadvydas* demands a legal conclusion intimately tethered to a practical reality—whether removal is likely to occur. Thus, because the Court must "take appropriate account of the greater immigration-related expertise of the Executive Branch," the Trump Administration's third-country removal initiative must color the Court's *Zadvydas* analysis. *Zadvydas*, 533 U.S. at 700. Consequently, the Court adopts the following principles.

First, to carry the initial burden, an alien "must demonstrate that 'the circumstances of *his* status' or the existence of 'particular *individual* barriers to his repatriation' . . . are such that there is no significant likelihood of removal in the reasonably foreseeable future." *Idowu v. Ridge*, No. 3:03-CV-1293, 2003 WL 21805198, at *4 (N.D. Tex. Aug. 4, 2003) (Ramirez, J.) (quotation omitted) (emphases added). Speculation, conjecture, or

---

[4] The Court takes judicial notice of Mobile Pathway's data on third-country removal orders. *See* Fed. R. Evid. 201.

"lack of visible progress" are not enough. *Id.* Rather, an alien must make a non-conclusory showing that "ICE is incapable of executing his removal" in the "near future." *Nagib v. Gonzales*, No. 3:06-CV-294, 2006 WL 1499682, at *3 (N.D. Tex. May 31, 2006) (Sanderson, J.).

Second, once the burden shifts, the Government cannot succeed merely by showing that it has made "good faith efforts" and removal is not "impossible." *Surovtsev v. Noem*, No. 1:25-cv-160, 2025 WL 3264479, at *7 (N.D. Tex. Oct. 31, 2025) (Hendrix, J.) (quoting *Zadvydas*, 533 U.S. at 702). But it also need not immediately produce detailed plans to effectuate removal to another country. If DHS identifies third-country removal as a reasonable alternative, "[t]he Court is obligated to 'giv[e] due weight to the likelihood of successful future negotiations.'" *Id.* (citing *Zadvydas*, 533 U.S. at 702). Considering the Administration's present initiative, this Court "has no reason to believe that these [removal] efforts will be unsuccessful"; rather, such negotiations render "removal to a third country . . . likely in the foreseeable future." *Misirbekov v. Venegas*, 796 F. Supp. 3d 436, 439 (S.D. Tex. 2025) (Olvera, J.).

This standard no doubt places a high burden on detainees. But by "recogniz[ing] primary Executive Branch responsibility," this approach accords with ordinary principles of judicial review in immigration matters. *Zadvydas*, 533 U.S. at 700. Furthermore, the standard focuses on the core concern of the *Zadvydas* opinion—situations where detention "d[oes] not serve its purported immigration purpose" because removal is "no longer

practically attainable." *Demore v. Hyung Joon Kim*, 538 U.S. 510, 527 (2003) (citing *Zadvydas*, 533 U.S. at 690).

Having adopted these interpretive principles, the Court returns to the facts at issue. Since re-detaining Petitioner in November, Respondents have actively explored his removal both to France, as well as Portugal, the country designated in his removal order. Doc. 9-7 ¶¶ 16–26. When those negotiations stalled in June, DHS engaged the State Department to identify other appropriate countries for third country removal. *Id.* ¶ 26–30. That process is ongoing. *Id.* ¶ 31.

In opposition, Petitioner argues that although he spent ten years on an OSUP and now nearly nine months in confinement, DHS has yet to secure travel documents for his removal to Portugal. Doc. 10 at 7. According to Petitioner, "[h]e simply cannot be removed unless or until a country other than his native country agrees to accept him." *Id.* Petitioner further argues that Respondents' exhibits demonstrate that they have yet to even identify a third country, let alone initiate an application to remove him there. *Id.*

However, in light of the Administration's general commitment to third country removals, and the demonstrated alacrity with which DHS has acted to realize that commitment, "lack of visible progress" cannot equate to good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future. *See Idowu*, 2003 WL 21805198, at *4. Instead, Petitioner has failed to carry his initial burden, as he has not shown that "ICE is incapable of executing his removal" in the "near future." *Nagib*, 2006 WL 1499682, at *3. Petitioner has not identified any personal information or

distinguishing circumstances that would prevent him from being removed to any of the third countries with which the Executive Branch has secured repatriation agreements. Instead, the Petition is best read as a complaint that DHS has pursued his removal to Portugal for far too long. DHS has now pivoted to exploring other third country removal options, and the Court defers to the agency to expeditiously remove him to one of these countries. For now, Petitioner has failed to present good reasons to believe that his removal is not significantly likely to occur in the reasonably foreseeable future. As such, his detention is consistent with 8 U.S.C. § 1231(a)(6) and has not yet arisen to a due process violation under *Zadvydas*. The claims must be dismissed.

**B. *Accardi* Doctrine**

Petitioner's *Accardi* Doctrine claim merely presents a variant of a familiar challenge to detention that this Court has consistently rejected. Petitioner argues that his arrest while on his OSUP was unlawful because DHS failed to comply with 8 C.F.R. §§ 241.4(l)(2) and 241.13(i)(2). The Court, however, has joined several courts in holding that "an illegal arrest has no bearing on the legality of detention following that arrest." *See Campos Bernal v. Frink*, 4:26-cv-2239, 2026 WL 1804234 (S.D. Tex. June 23, 2026) (citing *Carnesolta v. Tate*, No. 4:26-CV-01006, 2026 WL 948727, at *4 (S.D. Tex. Apr. 8, 2026) (Eskridge, J.); *Hechavarria-Vasquez v. Tate*, No. CV H-26-1266, 2026 WL 1427003, at *2 (S.D. Tex. May 21, 2026) (Lake, J.); *Navdeep v. Warden Ero El Paso Camp E. Montana Det. Ctr.*, No. EP-26-CV-829-KC, 2026 WL 1179624, at *2 (W.D. Tex. Apr. 23, 2026) (Cardone, J.)).

The Court sees no reason to limit this ruling to pre-removal-order arrests violative of 8 C.F.R. § 287.8(c). Instead, the holding applies in equal force regardless of when an alien is brought into custody during the removal process. Therefore, even if Petitioner's arrest violated either Section 241.4(l)(2) or 241.13(i)(2), the Court cannot remedy the violation by ordering his release from custody. His *Accardi* Doctrine claim must be dismissed.

**C. Administrative Procedure Act**

Finally, Petitioner contends that Respondent's decision to re-detain him violates the APA. Doc. 5 ¶¶ 75–84. The Court recently rejected this precise claim, holding that *habeas corpus*, rather than the APA, is the appropriate vehicle to challenge post-removal-order detention. *See Qambari v. Mullin*, No. 4:26-cv-2547, at 4 (S.D. Tex. July 2, 2026) (citing 5 U.S.C. § 704; *Immigr. and Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 305 (2001); *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025)). Petitioner's APA claim therefore must be dismissed.

## III. CONCLUSION

For the foregoing reasons, DHS has acted within its discretion to continue to detain petitioner under 8 U.S.C. § 1231(a)(6). His detention violates neither the statute nor due process. And Petitioner's remaining claims similarly do not entitle him to relief. Respondent's Motion for Summary Judgment is GRANTED, and the Petition is DISMISSED WITHOUT PREJUDICE to raising a due process challenge should detention

unreasonably continue and DISMISSED WITH PREJUDICE in all other respects. The Clerk of Court is directed to CLOSE this case. A final judgment will be entered separately.

**SO ORDERED.**

**SIGNED** at Houston, Texas, on the 31st of July, 2026.

Nicholas J. Ganjei
United States District Judge